PETER G. GALLOP, ADMR. OF DURWOOD GALLOP, v. B. PRESTON CLARK ET ALS., ASSOCIATED UNDER THE NAME AND STYLE OF PINE ISLAND CLUB, AND ST. CLAIR LEWARK.

(Filed 17 September, 1924.)

**1. Principal and Agent—Torts—Scope of Agency—Respondeat Superior.**

The principal is liable in damages for a tort committed within the scope of his agent's employment, whether the tortious act resulting in the injury was expressly authorized by him or not.

**2. Same—Game—Evidence—Questions for Jury—Trials.**

Where the one employed to guard the game preserves of those associated together into a hunting club shoots and fatally injures one who has gone there for the purpose of shooting the game that he was employed to guard, he is acting within the apparent scope of his employment, and the principals are responsible in damages for his wrongful act. The evidence in this case *held* sufficient to take the case to the jury.

THIS is an appeal by the defendants from a judgment rendered by *Devin, J.,* at May Term, 1924, of CURRITUCK.

The first issue submitted to the jury, with the answer thereto, was as follows: (1) Was the death of plaintiff's intestate caused by the wilful, wanton, or reckless conduct of the defendant Lewark, as alleged in the complaint? Answer: Yes.

It was alleged in the complaint "That on the .... day of November, 1920, plaintiff's intestate, Durwood Gallop, in company with a companion, was in a boat, on the waters of Currituck County, adjacent to property held and claimed by the defendants, other than Lewark, and guarded by the said Lewark, and that as said Durwood Gallop and his

companion approached said property in said boat, the defendant Lewark, the employee and servant of his codefendants, wrongfully and unlawfully undertook to drive away the said Durwood Gallop and his said companion, and in so doing, wrongfully and unlawfully shot and mortally wounded the said Gallop, as a result of which he shortly thereafter died."

The defendants all denied said allegation. There was evidence, however, sufficient to support the affirmative of said issue. There was no exception by defendants to the evidence or to the charge of the court relative to this issue.

The second issue submitted to the jury, with the answer thereto, was as follows: (2) If so, was defendant Lewark, at the time, acting within the scope of his employment by his codefendants? Answer: Yes.

The plaintiff offered evidence relative to this issue, tending to show the facts, as follows:

The defendants, other than Lewark, on Thanksgiving Day, 1920, and for some years prior thereto, were the owners and in possession of "all that tract or parcel of land, and improvements thereon, bounded and described as follows: On the north by Indian Gap, Beasley's Bay, and the lands of the Currituck Shooting Club; on the east by the Atlantic Ocean; on the south by North Banks, or Bank Woods, and Currituck Sound; and being all of the land, of every nature and description, formerly owned by Josephus Baum, within said boundaries and in said sound, including all marsh land, beach land, islands of marsh, and lands covered by water contiguous and adjacent thereto, and islands in said sound." A club house and other facilities for hunting and shooting wild fowl was maintained by the defendants on the said tract of land. The property was used as a game or hunting preserve, for the benefit of the defendants and their guests. The defendants, other than Lewark, are associated together and known as the Pine Island Club.

The defendant Lewark was employed by his codefendants as a guard, or watchman, upon said property. He was required to watch over and guard said property, keeping a lookout for trespassers who might come on the same to hunt or shoot game. He went on duty each year in October, and remained on duty until the last of March of the succeeding year, thus being constantly on duty during the hunting season. The purpose of his employment was to protect the property, and especially the wild fowl and other game thereon, from trespassers. He often carried a rifle with him, and this fact was known to the superintendent of defendants, the owners of the property.

It is the habit of wild geese and duck, the game which made this property valuable as a hunting preserve, to feed during the winter months on the marsh lands and in the shallow water contiguous and

adjacent to the islands in the sound. At nightfall they come in large numbers from the open sound to these marshes and shallow waters, when and where hunters in boats or blinds shoot them as they fly about. Decoys are placed about in the shallow water, and the hunters place themselves at convenient places to shoot the wild geese and duck as they fly toward these decoys. The value of the property as a private game preserve depends largely upon keeping others from shooting the wild geese and duck as they come in at nightfall to these marshes and shallow waters to rest during the night. It was the duty of the defendant Lewark to keep a lookout for trespassers upon these marshes and shallow waters at the close of day in order that the geese and duck should not be disturbed as they went to their resting place.

During the afternoon of Thanksgiving Day, 1920, having been engaged in picking cotton during the morning, Durwood Gallop and James B. Shannon, both of them farmers, one with a double-barreled and the other with a single-barreled gun, went from their homes across the sound in a boat, towards the Pine Island Club property, to kill a goose. They rowed their boat north up Great Gap to Arc Cove. They stopped off in the sound, about 25 yards from the mainland, behind an island. It was about sundown, but light enough to see. Neither had fired a gun, but they were waiting for the geese to fly over toward the marshes and shallow waters, expecting then to get a shot. While thus waiting for the geese, sitting in their boat, with their guns, ready to shoot, they saw the defendant Lewark and another guard coming around the marsh in a skiff, or small boat. When they first saw Lewark he was 45 or 50 yards away, with a small island between them. As Lewark came around the island, he called to them that he would beat them if they did not leave. Both Gallop and Shannon knew Lewark, and knew that he was employed as a guard on the defendant's property. They turned their boat around, and as they did so, Lewark, again calling to them, began to shoot with a rifle. He shot between fifteen or twenty times, the fourth shot striking Gallop as he sat in the boat, inflicting the mortal wound. While Lewark was shooting, the boat was on the marsh and near the island. During the shooting, the boat, as it was being turned around, was at one time pointed toward the club property. After the shooting had ceased and Durwood Gallop had been mortally wounded, Shannon, his companion, rowed away rapidly.

Durwood Gallop died on Sunday morning following Thanksgiving Day, his death being the result of the gunshot wound received when Lewark was shooting at him in the boat. At the time of the shooting, Lewark and Wicker, the guard with him, had gone around the point in the marsh and had stopped in the marsh. They were about 125 yards from Gallop and Shannon.

At the close of plaintiff's evidence, the defendants, other than Lewark, moved for a judgment of nonsuit. Motion overruled, and defendants excepted.

Thereupon the defendants offered evidence tending to show the facts relative to the second issue, as follows: Lewark was forty-seven years old at the time of the shooting, and had been employed by Dr. Baum, the superintendent of the club, for about ten years. His duty was to watch the marsh, and if anybody trespassed, to ask him to leave. If such person did not leave, it was his duty, after making the request, to report the matter to Dr. Baum. He had no authority from Dr. Baum or the defendants to do anything else. He was on duty Thanksgiving Day, 1920, guarding and watching the marsh. Lewark testified that he had no ill will toward Gallop and Shannon, and did not know Gallop, nor did he see them or shoot at any one on that day. Neither Dr. Baum, the superintendent, nor any member of the club authorized Lewark to use or carry a rifle or gun with him while performing his duty as a guard or watchman, although Dr. Baum knew that he sometimes carried a rifle in his boat while on duty, and most of the time carried a gun of some description. A camp on the premises of the defendants was provided for the guards, and Lewark spent the nights at one of these camps. He spent the night of Thanksgiving Day at his camp.

No objection was ever made by members of the club to shooting, unless those who did the shooting came upon the marsh or the island. No one was permitted to hunt on the property of the club except the members and their guests.

At the close of all the evidence, the defendants, other than Lewark, renewed their motion of nonsuit. Motion overruled, and defendants excepted.

The third issue submitted to the jury, with the answer thereto, was as follows: (3) What damage, if any, is the plaintiff entitled to recover? Answer: $10,000.

There was no exception by the defendants to the evidence or charge of the court relative to this issue.

None of the exceptions to evidence noted during the progress of the trial, or to the charge of the court, and assigned as errors, were discussed in plaintiff's brief. The only exceptions and assignments of error relied upon by the defendants in their brief or in the argument upon appeal in this Court were to the refusal of the court to sustain the motions of nonsuit made at the close of the plaintiff's evidence and renewed at the close of all the evidence.

Judgment was rendered upon the verdict in favor of the plaintiff and against the defendants. The defendants duly excepted to this judgment and appealed therefrom to the Supreme Court.

*Ehringhaus & Hall for plaintiff, appellee.*

*Aydlett & Simpson and McMullan & Leroy for defendants, appellants.*

CONNOR, J.   The defendants having abandoned, in their brief and in the argument upon their appeal to this Court, all exceptions except those based upon the refusal of the court to sustain the motions for nonsuit, made at the close of the plaintiff's evidence and renewed at the close of all the evidence (Rule 28, 185 N. C., 798), the only question presented to this Court is whether or not there was sufficient evidence to sustain an affirmative answer to the second issue, which was as follows: "If so, was defendant Lewark at the time acting within the scope of his employment by his codefendants?"   The defendant Lewark did not move for judgment of nonsuit, and did not appeal from the judgment appearing in the record.

It was admitted by his codefendants that Lewark was employed by them as a guard and watchman upon their property, maintained by them as a hunting or game preserve.   It was his duty to watch the marsh, and if any one trespassed, to ask them to leave.   At the time the defendant Lewark, by his "wilful, wanton, or reckless conduct, caused the death of plaintiff's intestate," as found by the jury in their answer to the first issue, Lewark was in the performance of his duty as a guard, and the plaintiff's intestate and his companion, in a boat, with guns, at nightfall, when the wild geese and duck were flying to the marsh or shallow waters adjacent or contiguous to the property of the defendants, were waiting to get a shot at the wild geese and duck. Lewark was expressly authorized by his codefendants and employers to guard their property from such persons as were doing the very things that the plaintiff's intestate and his companion were doing.   It is true that neither of them had fired a gun, but there is evidence sufficient for the jury to infer that Lewark knew what their purpose was at the time he ordered them off and fired the fatal shot.   The fact that Lewark, before shooting, ordered the plaintiff's intestate and his companion to leave the place at which they had stationed themselves, is evidence that Lewark regarded them as trespassers, whom it was his duty to warn, and against whom it was his duty to protect the property of the defendants.

The liability of the defendants for the conduct of Lewark does not depend upon a finding by the jury that he was expressly authorized to perform his duty in guarding the property by a wilful, wanton, or reckless act.   As Lewark was acting within the scope of his authority and was furthering the business of his employers, his employers are liable for the injury which he then inflicted upon Durwood Gallop by his

wilful, wanton, or reckless act, done in furtherance of the business for which he was employed by appellants.

Judge Devin, in a full, fair and correct charge to the jury, instructed them as follows upon the second issue: "A person is responsible, not only for his own acts, but for the acts of his employees and of his agents when they are done within the scope of their employment and in furtherance of the business which is entrusted to them. The test of the liability, in all cases, depends upon the question whether the injury was committed by the authority of the master, expressly conferred or fairly implied from the nature of the employment and the duties incident to it. The simple test is whether they were acts within the scope of his employment—not whether they were done while prosecuting the master's business, but whether they were done by the servant in furtherance thereof, and were such as may fairly be said to have been authorized by him. By 'authorized' is not meant authority expressly conferred; but whether the act was such as was incident to the performance of the duties entrusted to him by the master, even though in opposition to his express and positive orders. An act is within the scope of the servant's employment where necessary to accomplish the purpose of his employment and intended for that purpose, although in excess of the powers actually conferred upon the servant by the master. The purpose of the act, rather than its method of performance, is the test of the scope of employment." There was no exception to this instruction.

*Justice Walker,* in *Jackson v. Telegraph Co.,* 139 N. C., 348, says: "Whoever commits a wrong is liable for it, and it is immaterial whether it be done by him in person or by another acting by his authority, express or implied. *Qui facit per alium facit per se.* Upon this maxim of the law is founded the doctrine that the principal is liable for the tort of his agent, and the master for the tort of his servant. If the wrongful act is done by express command of the master, or even if he has afterwards made it his own by adoption, there is no difficulty in applying the rule; but it is otherwise when the liability must proceed only from an implied authority. Where the servant does a wrong to a third person, the rule of *respondeat superior* applies, and the master must answer for the tort if it was committed in the course and scope of the servant's employment and in furtherance of the master's business."

This rule has been so often stated as the law of this State that it would seem unnecessary to cite authorities sustaining it. In *Pierce v. R. R.,* 124 N. C., 93, *Clark, C. J.,* says: " 'In the furtherance of the business of employer' means simply in the discharge of the duties of the employment, and the court properly told the jury that the defendant is responsible for the injury if caused by the wrongful act of the employee while acting in the scope of his employment."

GALLOP *v.* CLARK.

In the same opinion the following is stated as the law: "Where the act is within the scope of the servant's authority, express or implied, it is immaterial whether the injury resulted from the result of his negligence or from his wilfulness and wantonness; nor is it necessary that the master should have known that the act was to be done. It is enough if it is within the scope of the servant's authority." To make the master liable it is not necessary to show that he expressly authorized the particular act; it is sufficient to show that the servant was acting at the time in the general scope of his authority, and this although he departed from his instructions, abused his authority, was reckless in the performance of his duty, and inflicted unnecessary injury.

In *Cook v. R. R.,* 128 N. C., 333, it is said: "If any servant, 'acting in the general scope of his employment, wrongfully assaulted the plaintiff, and such wrongful assault caused the injury, the defendant is liable'—that is to say, if the conductor, *while acting as conductor,* or the flagman or brakeman, while *on duty as flagman or brakeman,* wrongfully assaults one on the train, even though such person be a trespasser, and such wrongful assault is the proximate cause of the injury, the carrier is liable. 'Acting within the general scope of his employment' means while on duty, and not that the servant was authorized to do such acts."

In *Butler v. Mfg. Co.,* 182 N. C., 547, *Justice Adams* cites and approves the statement made by *Walker, J.,* in *Daniel v. R. R.,* 136 N. C., 517, as follows: "It may then be gathered from the books as a general rule, which is clearly applicable to the facts of this case, that if the servant, instead of doing that which he is employed to do, does something else which he is not employed to do at all, the master cannot be said to do it by his servant, and, therefore, is not responsible for what he does. It is not sufficient that the act showed that he did it with the intent to benefit or to serve the master. It must be something done in attempting to do what the master has employed the servant to do. Nor does the question of liability depend on the quality of the act, but rather upon the question whether it has been performed in the line of duty and within the scope of the authority conferred by the master." See *Munick v. Durham,* 181 N. C., 188; *Clark v. Bland,* 181 N. C., 112.

Applying these rules to the evidence in this case, the jury was well justified in finding:

(1) That Lewark was the servant or employee of his codefendants, and that his duty by virtue of this employment was to guard or watch the marshes and shallow waters adjacent or contiguous to the property which the said defendants maintained as a private shooting or game preserve.

(2) That at the time of the shooting, plaintiff's intestate and his companion were engaged, or about to engage, in the very acts which it was the duty of Lewark, by virtue of his employment, to prevent, to wit, shooting at the wild geese and duck as they were flying from the open sound to the marsh and shallow water adjacent and contiguous to the property of defendants.

(3) That at the time Lewark fired at the plaintiff's intestate and his companion he was acting within the scope of his employment, to wit, guarding the defendant's premises against persons who threatened to shoot wild geese and duck on the defendant's premises.

(4) That the conduct of the said Lewark in shooting at plaintiff's intestate and his companion was in furtherance of his codefendants' business for which he was employed, to wit, in protecting their property from trespass.

(5) That while his act in shooting at plaintiff's intestate and his companion was not expressly authorized by defendants, it was done in the scope of their employment and in order to accomplish the purpose for which he was employed, to wit, protecting wild fowl which were on, or about to come upon, the defendants' premises to rest during the night, from plaintiff's intestate and his companion.

We are of the opinion that the exceptions to the refusal of the court to sustain the motion of nonsuit are not sustained, and that his Honor's ruling was in accord with the law of North Carolina as frequently stated in opinions of this Court. It is therefore ordered that the judgment be and the same is affirmed.

No error.